IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **JUSTINE DAILY,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| *versus* | ) | Case No.   CIV-14-550-HE |
| | ) | |
| **USAA CASUALTY INSURANCE COMPANY,** | ) | |
| | ) | |
| Defendant. | ) | |

## PLAINTIFF'S RESPONSE TO
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Jeff D. Marr, OBA No. 16080
Carole Dulisse, OBA No. 18047
**MARR LAW FIRM**
4301 Southwest Third Street, Suite 110
Oklahoma City, OK  73108
Telephone:(405) 236-8000
Facsimile: (405) 236-8025
jeffdmarr@marrlawfirm.com
cdulisse@marrlawfirm.com

Reggie Whitten, OBA No. 9576
Michael Burrage, OBA No. 1350
J. Revell Parrish, OBA No. 30205
WHITTEN BURRAGE
1215 Classen Drive
Oklahoma City, OK  73103
Telephone:  (405) 516-7800
Facsimile:  (405) 516-7859
rwhitten@whittenburragelaw.com
mburrage@whittenburragelaw.com
rparrish@whittenburragelaw.com

### ATTORNEYS FOR PLAINTIFF

June 12, 2015

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

RESPONSE TO USAA'S UNDISPUTED MATERIAL FACTS ...................................... 3

ADDITIONAL MATERIAL FACTS WHICH PRECLUDE
   SUMMARY JUDGMENT ................................................................................. 10

STANDARD OF REVIEW .................................................................................... 14

ARGUMENTS AND AUTHORITIES ...................................................................... 15

    I.    USAA IS NOT ENTITLED TO SUMMARY JUDGMENT ON
         DAILY'S BAD FAITH CLAIM ................................................................. 15

        A.  USAA's Investigation of Daily's Claim Was Neither Prompt,
            Nor Reasonable. ................................................................. 19

        B.  USAA Had All Of The Information Needed to Pay the Claim ............. 19

        C.  USAA's "Dispute" of Daily's Claim is Anything But Legitimate ....... 24

    II.    USAA IS NOT ENTITLED TO SUMMARY JUDGMENT ON
         DAILY'S BREACH OF CONTRACT CLAIM ........................................... 25

        A.  There is No Evidence Supporting Failure To Cooperate, Or That
            Undertaking Repairs to the Home Constitutes Spoliation. ................... 27

    III.   SUMMARY JUDGMENT ON PUNITIVE DAMAGES
         IS UNWARRANTED ............................................................................ 29

CONCLUSION ................................................................................................. 30

CERTIFICATE OF SERVICE ............................................................................... 31

## <u>TABLE OF AUTHORITIES</u>

***Cases***

*Allen v. White*, 2010 WL 2985967, * 3, (W.D. Okla. April 22, 2010) ............................. 25

*Badillo v. Mid Century Ins. Co.,* 121 P.3d 1080, 1094 (Okla. 2005)......................... 15, 30

*Beers v. Hillory*, 2010 OK CIV APP 99, 241 P.3d 285 ...................................... 15

*Brown v. Patel,* 157 P.3d 117, 122 (Okla. 2007) ............................................... 28

*Bryant v. Sagamore Insurance Co.*, 597 F. App'x 968 (10th Cir. 2015).......................... 27

*Buzzard v. Farmers Ins. Co., Inc.,* 824 P.2d 1105, 1109 (Okla. 1991)...................... 16, 24

*Christian v. American Home  Assurance Co.*, 577 P.2d 899, 901 (Okla. 1977) ............ 15

*Flanders v. Crane Co.*, 693 P.2d 602, 605 (Okla. 1984) .................................... 15

*Haberman v. The Hartford Ins. Group, d/b/a Hartford Ins. Co. of the
    Midwest,* 443 F.3d 1257, 1269-70 (10th Cir. 2006) ...................................... 14

*JB Properties, LLC v. Certain Underwriter at Lloyd's London*, 2010 WL
    2196574, *6 (N.D. Okla. May 26, 2010)......................................................... 23

*McCarty v. First of Georgia Insurance Company,* 713 F.2d 609 (10th Cir.1983)........... 25

*McCorkle v. Great Atlantic Insurance Co.,* 637 P.2d 583, 587 (Okla. 1981).............. 14-15

*McCoy v. Oklahoma Farm Bureau Mut. Ins. Co.*, 841 P.2d 568 (Okla. 1992) ................. 17

*Moore v. Allstate*, 2014 WL 200777, *4 (W.D. Okla. Jan 17, 2014) ............................... 25

*Newport v. USAA,* 11 P.3d 190, 195  (Okla. 2000) ............................................. 19, 22, 23

*Oulds v. Principal Mut. Life Ins. Co.*, 6 F.3d  1431, 1440 (10th Cir. 1993)........... 16, 24

*Owen v. Farmers Insurance Co., Inc.*, 2014 WL 36643, *4 (E.D. Okla. Jan. 6, 2014).... 19

*Roemer v. State Farm Fire & Cas. Co.*, No. 06-CV-0663-CVE-PJC,
    2007 WL 527863, at *5 (N.D. Okla. Feb. 14, 2007) ....................................... 26

*Taylor v. State Farm Fire & Cas. Co.,* 981 P.2d 1253, 1258 (Okla.1999) ....................... 26

*Timberlake Constr. Co. v. U.S. Fidelity & Guar. Co.,* 71 F.3d 225, 343
 (10th Cir. 1995) ................................................................................................. 24

*Timmons v. Royal Globe Ins. Co.*, 653 P.2d 907, 917 (Okla. 1982) .............................. 15

*Trinity Baptist Church v. GuideOne Elite Ins. Co.,* 2009 WL 3004031,
 *3 (W.D. Okla. 2009) ........................................................................................ 30

*Vining v. Enterprise Financial Group*, 148 F.3d 1206, 1213 (10th Cir. 1998) ................ 17

*Vintage Plastics, LLC v. Massachusetts Bay Insurance Co.,* 2012 WL
 1142722, *3 (N.D. Okla. 2012) .......................................................................... 25

*Wells v. Colo. Dep't of Transp.,* 325 F.3d 1205, 1209 (10th Cir.2003) ........................... 14

*Willis v. Midland Risk Ins. Co.*, 42 F. 3d 607, 611-612 (10th Cir. 1994) ............ 16, 24

**Statutes**

FED. R. CIV. P. 56(c) ......................................................................................... 14

23 O.S. §9.1(B)(2) ............................................................................................ 29

23 O.S. §9.1(C)(2) ............................................................................................ 29

## INTRODUCTION

On May 20, 2013, Justine Daily's ("Daily") home sustained significant damage in the May 20, 2013, EF-5 tornado which devastated the City of Moore. At the time of the storm, Daily was in training with the U.S. Military in Fort Jackson, SC. Nevertheless, on May 21, 2013, the loss was timely reported to USAA. On May 28, 2013, having heard nothing from USAA, Daily's father went to the USAA catastrophe tent to inquire about an inspection and to advise that the roof had sustained significant damage and was spongy. On May 29, 2013, eight (8) days after the loss, the first inspection by Allcat took place. It is undisputed that significant damages were missed from that inspection.

As a result, upon returning from her military training, Daily called USAA and advised damages were missed. On June 27, 2013, the second inspection by Allcat occurred. The results from this inspection revealed an array of damages, which generally included extensive cracking on exterior and interior, a light switch that didn't work, sticking doors, and damage to the air-conditioning unit ("AC unit"). The record shows the "house had been shaken" by the tornado, and that tornado related damages could not be ruled out as ground zero was two streets over. At this time the damage estimate was supplemented to include replacement of the AC unit and an electrical repair allowance. It was also recommended that USAA consider an assignment of an engineer for the structural damage. While USAA did engage Rimkus Consulting Group, Inc. ("Rimkus"); it disregarded the supplemental damage estimate and failed to pay for the AC unit or electrical allowance. USAA also did not advise Daily of the findings from this inspection.

1

Roughly one month later (July 24, 2013), USAA received a report and clarification from Rimkus, which provided the storm had "expanded pre-existing cracks" and that the damage sustained to the exterior and interior were exacerbated by the tornado. USAA concluded from this report that the additional (and missed) damages were related to the tornado and *covered* under the policy. Nevertheless, no payment for these now undisputed damages was made. Instead, after coverage was confirmed, the desk adjuster handling the claim, assigned staff adjuster, Will Ball, to go to Daily's home to assist with the engineer report and inspect for damages missed by Rimkus.

On July 31, 2013, Mr. Ball (with the help of NAPCO, a PDRP) went to the Daily residence and confirmed undisputed damages, that included everything from interior and exterior cracking, foundation, trusses, roof and AC unit. During this review, Mr. Ball also confirmed the house had in fact sustained structural damages and determined the damages exceeded the findings of Rimkus. Measurements and photographs were taken, and the reserves were increased to $75,000. Again, and in spite of the confirmation of these undisputed damages, an estimate was never prepared and no payment by USAA was made.

Also, during this time period (May 20, 2013–July 25, 2013), Daily made repeated calls to USAA to (1) advise about the excessive and continued water coming into her home damage sustained to her home, (2) the failure of USAA or its engineer to inspect the attic, and (3) status of her claim. However, USAA admittedly was less than forthcoming and Daily was repeatedly advised to "hold off" on repairs pending a report from the engineer. It was not until July 25, 2013, that USAA told her it was okay to replace the roof. USAA maintains the damages incurred by Daily were brought on by her own action, it was

2

prevented from completing the damage estimate because it needed measurements. However, by this time, <u>four</u> (4) inspections had already occurred, and the evidence establishes USAA had all of the information it needed to complete the estimate. Nevertheless, from August 1, 2013, to October 9, 2013, nothing happened on the claim. USAA delayed processing Daily's claim and ultimately denied payment of undisputed damages that they had already determined were covered.

In spite of these facts, USAA has filed a Motion for Summary Judgment in this case, asking that the Court grant it summary judgment, based upon the conduct of Daily and/or her counsel. USAA further qualifies that the fact it took six (6) months and five (5) inspections to pay only <u>a portion</u> of the undisputed damages, that were undisputably missed and knew to be due and owing two (2) months after the loss, are nothing more than "insignificant quibbles." In fact, USAA claims Daily should be punished for its own failure to "pay what it owes" because she had the audacity to begin making the undisputed repairs to her home.

As set forth herein, there is abundant evidence – evidence that USAA does not even mention in its Motion – that shows its conduct was calculated and unreasonable. As such, Daily's claim can only be subject to jury review as evidence exists demonstrating that summary judgment is inappropriate. Daily requests the Court deny USAA's Motion.

## <u>RESPONSE TO USAA'S UNDISPUTED MATERIAL FACTS</u>[1]

1. **No. 1**: Undisputed.

---

[1] Referred to as "RUMF"

2. **Nos. 2-6**: Undisputed, but immaterial. Not a single claims adjuster of USAA has expressed any criticism of Daily or her counsel, and none have opined that she failed to cooperate with USAA in their investigation in any way. Ex. 1, G. Ralston, 21:12-15, Ex. 2, E. Mejia, 110:9-20, 155:23-156:7, Ex. 3, W. Ball, 36:14-19; Ex. 4, G. Moring, 103:13-24; Ex. 5, D. Quinn, 126:4-14, 427:12-428:1. Daily has produced over 700 photos (taken from August 18, 2014–December 2014) and over 30 pages of receipts and invoices substantiating her damages. Ex. 6, J. Daily, 197:3-23, 198:12-10, 320:3-325:25.

3. **Nos. 7-8 & 11**: Undisputed in part. Daily disputes the limited characterization by USAA of the damages as they were significant and her home had structural damage. Ex. 1, G. Ralston, 130:5-7; Ex. 2, E. Mejia, 49:23-51:14, 60:21-25, 73:16-20, Ex. 3, W. Ball, 86:24-87:15; Ex. 4, G. Moring, 17:24-18:4, 74:9-19, 75:4-8, 78:2-4, 78:25-79:4, 90:18-91:13; Ex. 7, USAA-1522-1523, Ex. 8, USAA-1527-1528, Ex. 9, USAA-2251-2253, n. 108-111.

4. **Nos. 9-10, 14-15 & 53-55**: Undisputed in part and disputed in part. Daily does not dispute that day the first inspection occurred or the amount paid for the dwelling, other structures, personal property or food spoilage. Daily disputes the first inspection was thorough and that she was paid for all undisputed damages. The first inspection was underscoped and significant damage was missed. Ex. 1, G. Ralston, 21:12-22:4, 27:15-28:13, 31:11-32:3, 32:19-17, 35:23-36:2, 95:5-25; Ex. 2, E. Mejia, 61:7-62:10, 77:16-78:10, 78:25-79:7, 105:14-107:2, 150:12-21, 152:6-154:8; Ex. 6, J. Daily, 203:2-204:1, 210:7-211:3. Further, the first estimate only paid for the shingles (removal and replacement), and failed to include payment for the decking or framing. Ex. 1, G. Ralston,

4

102:22-103:6, 104:6-13. Payment for <u>half the decking</u> was not paid until November 15, 2013. <u>Ex. 5</u>, D. Quinn, 269:16-270:11; <u>Ex. 6</u>, J. Daily, 210:7-211:3.

5. **Nos. 12-13**: Disputed. Daily never made any such request. <u>Ex. 6</u>, J. Daily, 285:2-286:11, 287:5-23, 288:3-5.

6. **No. 16**: Undisputed insofar as the date Daily called. Daily called to report damage that was <u>missed</u> after the <u>first</u> inspection. <u>Ex. 1</u>, G. Ralston, 21:12-25, 27:15-28:13; 95:5-25; <u>Ex. 2</u>, E. Mejia, 61:7-62:10, 78:25-79:7; <u>Ex. 6</u>, J. Daily, 304:16-25.

7. **Nos. 17-18**: Undisputed insofar a recommendation and assignment was made. Disputed as the damages were not new, but had been missed. On July 2, 2013, USAA knew from the <u>second</u> inspection the following damages: (1) Cracks in brick veneer, (2) Cracks in the brick veneer on front elevation, cracks in brick veneer in the concrete grade beam on the right and left and rear elevations, (3) Interior cracks in the drywall ceiling and the walls in master bath and bedroom, (4) One bedroom has a light switch that doesn't work from the storm, (5) notes several doors were sticking and were hard to close, and (6) damage to the AC unit. USAA was also advised that tornado related damage cannot be ruled out as ground zero was two streets over. A supplement to the damage estimate was made to allow for the undisputed damage for the AC unit replacement and an electrical repair allowance. USAA disregarded this estimate and knew Daily had not been paid. <u>Ex. 1</u>, G. Ralston, 77:11-78:1, 79:20-81:13, 81:14-21, 81:22-82:6, 83:9-84:3; <u>Ex. 2</u>, E. Mejia, 79:8-80:10, <u>Ex. 8</u>, USAA-1527-1528; <u>Ex. 10</u>, 6/27/13 R. Estimate; <u>Ex. 11</u>, USAA-2241-2242, n. 74, 75 & 77.

8. **Nos. 19-22**: Undisputed, but immaterial. After USAA received the Rimkus report and addendum, they determined that the damages were *covered* under the policy. Once this determination was made, USAA assigned Will Ball, staff adjuster, to assist the claim to identify damages missed by Rimkus and prepare an estimate for the undisputed damages. Mr. Ball confirmed Daily's home had sustained structural damage, was a large loss and found additional damages that were missed by previous adjustors (everything from sheetrock to brick and foundation, to the master bathroom and bathroom, kitchen damage that wasn't listed, foundation repair, and the roof and rafters) and increased the reserves to $75,000. Ex. 1, G. Ralston, 40:21-42:22, 57:6-15 129:14-130:7, 130:19-131:23, 105:14-107:2, 150:12-21, 152:6-154:8, 155:22-156:9, 161:19-23, 162:8-163:1, 164:5-165:2; Ex. 2, E. Mejia, 49:23-51:14, 60:21-25, 73:16-20, 53:6-18, 76:4-77:6, 85:15-86:23, 88:19-89:18, 91:3-21; Ex. 6, J. Daily, 300:17-301:3; Ex. 9, USAA-2251-2253, n. 108-111; Ex. 12, USAA-2250, n. 102.

9. **Nos. 23-25**: Undisputed, but immaterial.

10. **Nos. 26-27**: Disputed. Nothing in the claim file indicates that any additional information was needed after Mr. Ball's inspection from August 1–12. Only after counsel was engaged did USAA claim measurements were needed. USAA knew the extent and scope of the undisputed damages on August 1, 2013, and has no explanation whatsoever for why no payment was made until November 15, 2013. Ex. 2, E. Mejia, 96:11-98:8, 102:7-23, 102:7-103:23, 107:21-108:5, 155:2-22; Ex. 3, W. Ball, 177:20-180:24, 185:12-186:22, 187:25-188:10. After counsel was engaged, Daily's claim was reassigned to a large loss adjuster on October 10, 2013. The large loss adjuster was on site within six (6) days

6

of the assignment and was not critical of counsel or Daily for the time it took to schedule that inspection. Ex. 2, E. Mejia, 47:19-49:16; Ex. 6, D. Quinn, 128:25-130:3, 131:10-22. Further, it is undisputed that USAA identified damages, which surpassed the findings of Rimkus (that still have not been paid) and had all of the measurements from the previous adjusters (as well as from the PDRP), and could have written an estimate after August 1, 2013. Ex. 2, G. Ralston, 31:11-32:3, 32:19-17, 35:23-36:2; Ex. 3, W. Ball, 30:12-31:7, 36:20-37:4, 65:14-16, 148:24-149:7, 151:15-24, 181:25-182:25, 196:8-22, 238:17-239:6; Ex. 4, G. Moring, 54:1-23, 55:10-56:25, 58:3-18, 63:23-64:5 Ex. 5, D. Quinn, 205:2-206:10, 208:4-11, 215:8-216:8; Ex. 6, J. Daily, 299:10-14, 301:19-302:2. No one from USAA ever asked the previous adjusters or the PDRP for measurements or for an estimate. Ex. 1, G. Ralston, 149:7-150:21; Ex. 3, W. Ball, 71:13-72:5, 194:2-4, 195:7-19; Ex. 9, USAA-2251-2253, n. 108-111.

11. **Nos. 28-31 & 37-38**. Disputed. Mr. Quinn acknowledged that the two previous adjusters were duty bound to make complete notes and were required to thoroughly scope the damage. Further, as of August 1, 2013, the reserves were increased to $75,000 and USAA had already determined, confirmed and agreed on the scope and extent of the undisputed damages (which exceeded Rimkus' findings). These undisputed damages included the AC unit, brick, foundation, sheetrock and trusses. USAA admits payment for these undisputed damages should have been paid, rendering USAA's belated attempt to later resurrect coverage issues and delay payment unreasonable. Ex. 3, W. Ball, 73:16-74:19, 113:6-25, 106:21-107:13, 127:20-128:10 143:15-145:7, 145:22-146:19, 147:6-10, 157:21-159:13, 171:1-22, 172:1-8, 176:4-20., 171:23-172:2, 177:6-19, 183:13-184:7,

7

240:17-242:8; Ex. 4, G. Moring, 64:6-11, 65:20-66:2, 66:17-25. 67:14-68:3, 74:9-19, 75:4-8, 78:2-19, 78:25-79:4, 90:18-91:13; Ex. 9, USAA-2251-2253, n. 108-111.

12. **No. 32**: Disputed. Unsupported and contradicted by record. As of August 1, 2013, USAA had identified the outstanding damages, which surpassed the findings of Rimkus (that still have not been paid). Further, no one from USAA or Rimkus ever inspected the attic. Ex. 1, G. Ralston, 54:19-56:9, 56:14-56:25, 105:19-24, 106:25-107:22, 109:12-18, 110:8-11, 110:12-111:1, 154:12-155:6; Ex. 2, E. Mejia, 120:13-121:13, 123:3-10; Ex. 5, D. Quinn, 351:5-16, 425:23-426:20; Ex. 9, USAA-2251-2253, n. 108-111.

13. **Nos. 33-35**: Disputed. July 25, 2013, is the first time Daily is told she can repair the roof by USAA. Prior to this, she is advised to wait for the engineer to inspect and write his report. There was never an agreed scope on damage and at this point she had only been paid for shingles. USAA also has nothing to support its opinion that the trusses were not damaged. Ex. 1, G. Ralston, 102:22-103:6, 104:6-13, 108:7-22, 109:12-18, 110:8-11, 111:21-113:7, 120:23-122:25, 123:11, 139:4-25, 140:1-141:25, 142:4-21; Ex. 2, E. Mejia, 126:13-17, 127:16-129:8, 129:23-130:11, 136:1-25, 138:13-22; Ex. 5, D. Quinn, 269:16-270:11; Ex. 6, J. Daily, 210:7-211:3; Ex. 13, USAA-2243-2244, n. 88-89. USAA told Dailey in July that they would not be reinspecting the roof. Ex. 1, G. Ralston, 68:10-25. Because there was no agreed upon scope, Daily's contractor attempted to fix the trusses per the estimate. Daily did not learn that the City of Moore had an issue with the trusses until August, 2014. The trusses were in the same condition when USAA performed it "inspection" in January, 2015; however, USAA did nothing other than take a few pictures.

No notes were made and no estimate was prepared. Ex. 5, D. Quinn, 303:3-306:15; Ex. 6, J. Daily, 328:20-329:6, 329:7-12, 330:11-19, 8-20.

14.   **No. 36**: Disputed. The City of Moore imposed significant code requirements which affected the electrical and trusses and required that the repairs be completed in conformance with Dr. Ramseyer's structural engineering report. Daily has incurred the cost from these codes. Ex. 6, J. Daily, 211:20-212:12, 261:7-25, 319:21-24, 327:21-328:15, Ex. 14, City Code. USAA stated it does not have to be up on the code, and it relies solely on the contractors for code requirements. USAA also agrees code issues are triggered under the Policy when the City requires an item to be brought up to code. USAA has not paid for any code requirements. Ex. 3, W. Ball, 185:1-5, 234:20-235:23; Ex. 5, D. Quinn, 233:2-24, 236:9-239:4, 247:19-24, 250:1-256:22, 257:7-262:11, 408:4-25, 410:6-15, 414:18-415:17.

15.   **Nos**. **39-43 & 51-56**: Undisputed in part and disputed in part. Daily began making repairs in January 2014, after she finally received a portion of the payment that was due and owing on August 1, 2013. To date, all the money paid by USAA has gone to repair her house, and the repairs are not complete. USAA has failed to pay all of the undisputed damages it confirmed existed on August 1, 2013. *See* RMUF 2; Ex. 6, J. Daily, 199:21-25, 326:23-327:19, 335:22-336:16.

16.   **Nos. 44-45**: Disputed. Daily's Third Amended Complaint (Doc. 39) pleads a breach of contract cause of action. An amended pleading supersedes the previous filing. Further, Daily supplemented her interrogatory responses and has produced hundreds of photos, receipts and invoices. RMUF 2; Ex. 15, Supp. Rog 2 & 6 and 12.

17. **Nos. 46-49 & 52**: Disputed. USAA performed at least <u>five</u> (5) inspections of the home prior to litigation. Further as of October 16, 2013, inspection Mr. Quinn admitted no repairs had started and nothing had been done to deprive USAA of the opportunity to perform whatever inspection it felt necessary. Further, Quinn did not perform an "inspection" in January, 2015, as he was just there to <u>observe</u>, did nothing other than take a few pictures and has not made any claims notes since the litigation began. <u>Ex. 1</u>, G. Ralston, 18:3-22, 19:1-14, 23:3-25, 25:11-26:21, 43:14-45:3; <u>Ex. 3</u>, W. Ball, 76:7-77:8, 78:12-25, 79:6-14, 233:14-19, <u>Ex. 5</u>, D. Quinn, 131:23-132:15, 133:2-19, 134:5-21 230:17-25, 244:9-23, 265:21-266:3, 295:22-296:11, 298:17-21, 303:3-306:15, 418:21-419:18.

## ADDITIONAL MATERIAL FACTS[2] WHICH PRECLUDE SUMMARY JUDGMENT

1. **No. 1**: USAA admits it must be truthful and cannot hide things from its members. USAA admits they were not upfront, honest or forthright with Daily. <u>Ex. 1</u>, G. Ralston, 9:17-10:3, 93:16-25, 94:1-14; <u>Ex. 2</u>, E. Mejia, 80:11-81:14, 139:13-18.

2. **No. 2**: USAA failed to listen to the concerns of Daily. Not one USAA adjuster (or their engineer) would go up into the attic, despite repeated requests from Daily to do so. Dr. Ramseyer is the only one who actually inspected the attic and documented damage thereto. <u>Ex. 1</u>, G. Ralston, 105:19-24, 106:25-107:22; 110:12-111:1; <u>Ex. 6</u>, J. Daily, 114:3-12, 211:4-212:12, 212:13-21, 263:8-264:22, 315:15-316:23, 317:12-318:25.

3. **No. 3**: USAA admits the attic should have been inspected, and Daily should have been able to rely on it to know what it was doing when it went out to adjust the claim. Admits

---

[2] Referred to as "AMF".

the attic was not inaccessible and a thorough inspection would have required it. Ex. 1, G.

Ralston, 56:19-56:25 105:3-10, 111:2-10, 154:12-155:15; Ex. 2, E. Mejia, 120:13-121:13,

123:3-10.

4. **No. 4**: Daily specifically left the attic alone because she wanted to be sure USAA had

time to do all of the inspections. Ex. 6, J. Daily, 264:25-265:16.

5. **No. 5**: Daily's roof sustained significant damage, had holes, was leaking and was

spongy. Daily made repeated calls to USAA advising them of the issues with water, and

USAA knew she had sustained damage from water throughout the house, which included

the wiring. USAA ultimately paid for replacement of insulation in the attic because of water

damage. Ex. 1, G. Ralston, 54:1-22, 56:4-5 68:10-25, 100:8-4, 101:9-12, 120:23-122:25,

123:11-124:5,124:10-126:4, 143:20-144:2; Ex. 3, W. Ball, 81:23-82:10, 128:11-17,

128:24-129:25, 131:21-132:22, 233:14-19, Ex. 6, J. Daily, 207:16-209:18, 210:10-24,

229:2-15, 230:1-8, 299:16-19, 300:1-5; Ex. 12, USAA-2250, n.103; Ex. 13, USAA-2243-

2244, 88-89.

6. **No. 6**: The first inspection (by Allcat) took place on May 29, 2013, nine (9) days after

the loss. The second inspection (by Allcat) took place on June 27, 2013, the third inspection

(by Rimkus) took place on July 11, 2013, and the fourth inspection (by Will Ball) took

place on July 31, 2013, and the fifth inspection (by Duane Quinn) took place on October

14, 2013. Ex. 1, G. Ralston, 43:23-45:3.

7. **No. 7**: On July 2, 2013, after the second inspection, USAA knew that payment for the

AC unit and electrical repairs were owed. However, USAA disregarded the supplemental

estimate, did not pay the claim and fails to discuss with Daily the findings from that

11

inspection. RUMF 7; <u>Ex. 1</u>, G. Ralston, 83:2-84:3,90:5-91:22, 92:9-24. 93:2-25, 101:5-8, 157:6-25., <u>Ex. 2</u>, E. Mejia, 83:2-13; <u>Ex. 10</u>, 6/27/13 R. Estimate; <u>Ex. 11</u>, USAA 2241-2242, n. 74-75 & 77.

8.   **No. 8**: On July 25, 2013, after the <u>third inspection</u>, USAA knew that the damages identified in the second inspection were related to the tornado and confirmed coverage under the policy for those damages. On this day, USAA knew Daily had undisputed damages that had not been paid. RUMF 8; <u>Ex. 2</u>, E. Mejia, 51:15-52:8, 53:6-10, 72:15-21, 85:5-19.

9.   **No. 9**: On August 1, 2013, after the <u>fourth inspection</u>, USAA knew Daily's home had sustained structural damage, was a large loss and confirmed and found additional damages that were missed by previous adjustors and Rimkus. Further, again the AC unit/furnace was recommended for replacement and payment. No payment was made to Daily from the July 31st inspection. RUMF 8; <u>Ex. 2</u>, E. Mejia, 91:3-23.

10.   **No. 10**:  Once USAA determined the loss was covered (on July 25, 2013), they assigned Mr. Ball to go out and prepare the estimate. To date, no estimate from Mr. Ball has ever been prepared. <u>Ex. 2</u>, E. Mejia, 88:19-89:18, 99:8-101:3.

11.   **No. 11**:  To date, USAA has not paid the undisputed damages for (a) the damage to trusses, (b) 50% of the footing, (c) all of the decking, (d) AC unit/furnace. USAA admits they cannot hold onto payment of undisputed damages. <u>Ex. 1</u>, G. Ralston, 163:2-20, 165:6-9; <u>Ex. 3</u>, W. Ball, 147:11-22; <u>Ex. 16</u>, S. Sullivan, 172:2-16.

12.   **No. 12**: Mr. Ball had extended conversations with Daily regarding the AC unit. The AC unit worked before the tornado, and Mr. Ball told Daily that the AC unit would be

replaced, but she never got an estimate and to date she has not been paid for it. <u>Ex. 3</u>, W. Ball, 145:12-21, 191:22-192:10, 194:24-195:6, <u>Ex. 6</u>, J. Daily, 44:15-45:1, 61:11-14, 173:4-174:14, 222:17-223:15, 289:12-22, 231:18-22, 310:10-311:25, 311:11-17, 312:3-313:22.

13. **No. 13**: There is nothing in USAA's claim file from July 25, 2013 – August 12, 2013, stating that measurements were needed before they could pay the claim or that investigation was not complete. <u>Ex. 2</u>, E. Mejia, 102:24-105:13, 107:21-108:5, 151:19-152:1; <u>Ex. 3</u> W. Ball, 121:12-25, 122:9-12, 154:7-13, 156:3-19, 172:9-23, 173:8-24, 174:1-17, 175:13-176:3; <u>Ex. 9</u>, at USAA-2252-2253, n. 111 & 113; <u>Ex. 17</u>, USAA-2254-2255, n.118.

14. **No. 14**: USAA inspected the house more than four times. Admits this was not a large house, and there was nothing particularly difficult about it to do a complete inspection. <u>Ex. 3</u>, W. Ball, 83:19-85:23

15. **No. 15**: Will Ball had the authority to make all decisions to resolve the scoping, estimating and measuring on behalf of USAA. <u>Ex. 2</u>, E. Mejia, 152:11-15.

16. **No. 16**: Mr. Ball had measurements and notes from the July 31, 2013, inspection, but he threw them away. <u>Ex. 3</u>, W. Ball, 72:15-23, 153:1-8.214:4-8, 229:20-230:5, <u>Ex. 9</u>, at USAA-2252-2253, n. 111 & 113.

17. **No. 17**: NAPCO, the PDRP who assisted Will Ball on July 31, 2013, had measurements and over 60 photos of the Daily house. <u>Ex. 9</u>, at USAA-2252-2253, n. 111 & 113; <u>Ex. 18</u>, NAPCO 8 & 10-26.

18. **No. 18**: On August 6, 2013, NAPCO advised USAA that "we reinspected property today. However, per insured they said someone at USAA cancelled appt." On August 15,

2013, after Daily had engaged counsel, USAA advised NAPCO, "please cancel assignment at this time. Per adjuster Will Ball, he will be working with insured." <u>Ex. 19</u>, USAA-01540, n. 8 & 9; <u>Ex. 20</u>, NAPCO 1-2.

## STANDARD OF REVIEW

Summary judgment requires the court to look at *all* the material facts and to view disputed facts in the light most favorable to the non-moving party. *Wells v. Colo. Dep't of Transp.,* 325 F.3d 1205, 1209 (10th Cir. 2003). If there are controverted material facts, or reasonable minds might reach different conclusions on undisputed facts, summary judgment should be denied. Only when the movant for summary judgment has met the initial burden is it incumbent on the non-movant to demonstrate the existence of a substantial dispute as to some material fact. Summary judgment proceedings are not intended to substitute a trial by affidavit or opinion report for a trial by jury. FED. R. CIV. P. 56(c).

The Tenth Circuit set forth rules governing when summary judgment would be inappropriate in a bad faith claim against an insurer where the claim arose in the State of Oklahoma, stating:

> [T]he essence of the intentional tort of bad faith with regard to the insurance industry is the insurer's unreasonable, bad-faith conduct, including the unjustified withholding of payment due under a policy, and if there is conflicting evidence from which different inferences may be drawn from the insurer's conduct, then what is reasonable is always a question of fact to be determined by the trier of fact by a consideration of the circumstances of each case.

*Haberman v. The Hartford Ins. Group, d/b/a Hartford Ins. Co. of the Midwest,* 443 F.3d 1257, 1269-70 (10th Cir. 2006)(citing *McCorkle v. Great Atlantic Insurance Co.,* 637

P.2d 583, 587 (Okla. 1981)). *See also*, *Badillo v. Mid Century Ins. Co.*, 121 P.3d 1080, 1094 (Okla. 2005), *Flanders v. Crane Co.*, 693 P.2d 602, 605 (Okla. 1984).

The Oklahoma Supreme Court has consistently stated that what is reasonable is always a question to be determined by the jury in the context of a bad faith action. *Beers v. Hillory*, 2010 OK CIV APP 99, 241 P.3d 285; *Badillo*, 121 P.3d at 1093. Considering these standards, USAA's Motion is without merit and must be denied.

## ARGUMENTS AND AUTHORITIES

**I. USAA IS NOT ENTITLED TO SUMMARY JUDGMENT ON DAILY'S BAD FAITH CLAIM.**

In support of its Motion, USAA ignores testimony and relevant portions of their own claim file, and instead tries to create a defense to its bad faith conduct by saying that any delay that that occurred was the fault of either Daily and/or her counsel. However, a review of the entire course of conduct of the parties reveals the claim is replete with instances of USAA's bad faith conduct. *Timmons v. Royal Globe Ins. Co.*, 653 P.2d 907, 917 (Okla. 1982)("the jury may be shown the entire course of conduct between the parties to arrive at a determination of whether that standard had been breached or not").

An insurance company has an "implied-in-law duty to act in good faith and deal fairly with the insured to ensure that the policy benefits are received." *Christian v. American Home Assurance Co.*, 577 P.2d 899, 901 (Okla. 1977). An insurance company is liable under the tort of bad faith where it unreasonably and in bad faith withholds payment of the clam of its insured. *Id.* The tort of bad faith is founded on the principle that:

> [a] claim must be paid promptly unless the insurer has a reasonable belief that the claim is legally or factually insufficient. ***The decisive question is***

> ***whether the insurer had a good faith belief, at the time its performance
> was requested, that there was a justifiable reason for withholding payment
> under the policy.*** To determine the validity of the claim, the insurer must
> conduct an investigation reasonably appropriate under the circumstances. ***If
> the insurer fails to conduct an adequate investigation of a claim, its belief
> that the claim is insufficient may not be reasonable.***

*Willis v. Midland Risk Ins. Co.*, 42 F. 3d 607, 611-612 (10th Cir. 1994)(internal citations

and quotations omitted)(emphasis added); *see also, Oulds v. Principal Mut. Life Ins.

Co.*, 6 F.3d 1431, 1440 (10th Cir. 1993). Thus, the essence of insurance bad faith is failing

to promptly pay a claim absent a reasonable belief that the claim is legally or factually

insufficient. *Buzzard v. Farmers Ins. Co., Inc.,* 824 P.2d 1105, 1109 (Okla. 1991).

The record demonstrates USAA does not have, and had never had, a justifiable reason for

the manner in which it handled Daily's claim.

From the onset, USAA delayed and mishandled Daily's claim. USAA tacitly admits it

underscoped and underpaid the claim from the beginning and have knowingly withheld

payment on undisputed damages. RUMF 4, 6-8 & 10; AMF 7-11. This disregard to actually

"pay what we owe" plagued each inspection that followed leaving behind a trail of unpaid,

undisputed damages. Indeed, even after three more inspections (by Allcat, Rimkus and

USAA), Daily was in no better position than she was in two months earlier. To the contrary,

even though USAA knew on August 1, 2013, that the damages were *covered* under her

policy, and they knew scope of "what needed to be done," they did nothing to pay her claim

and kept her in the dark throughout the entire process. RUMF 8; AMF 1-2, 7.

USAA admits they have a duty to be truthful and cannot hide things from their

members, yet concede this precisely what they did here. <u>AMF 1</u>. The record is clear, at no

16

point did USAA <u>ever</u> advise Daily of the findings from any inspection, come clean that Rimkus failed to perform a thorough inspection, or that payment for the AC unit and electrical should have been paid in July 2013. *Id*. Instead, USAA actively concealed their decisions at every step, and only relayed information to Daily they wanted to share. Making matters worse, USAA ignored Daily's repeated complaints about water infiltrating her house for over a month, and with each call, USAA simply told her to wait and that her roof was fine. RUMF 13; AMF 5. Ironically, USAA concedes the roof had significant holes, was spongy and likely posed a safety risk, and because of the truss damage, was putting pressure on the exterior wall, opening up the cracks. RUMF 8, 13; AMF 5. Yet, in spite of this, USAA now wants to claim that the damage sustained by the water (and to the house), was caused by Daily's own delay, because it paid for <u>shingles</u>. RUMF 4, 13; AMF 5.

Where the evidence shows the insurance company's actions may be reasonably perceived as tortious, summary judgment is inappropriate. *Vining v. Enterprise Financial Group*, 148 F.3d 1206, 1213 (10th Cir. 1998). Here the evidence does more than just cast doubt on USAA's good faith justification for disputing Daily's claim. *McCoy v. Oklahoma Farm Bureau Mut. Ins. Co.*, 841 P.2d 568 (Okla. 1992). Accordingly, USAA's Motion should be denied.

### A. *USAA's Investigation Of Daily's Claim Was Neither Prompt, Nor Reasonable.*

The record reflects that from May 20, 2013 to October 14, 2013, USAA performed at least five (5) inspections of Daily's home. It is undisputed that the <u>first</u> inspection (occurring eight (8) days after the loss) was underscoped and missed a significant amount of damage. RUMF 3-4 & 6; AMF 6. While the <u>second</u> inspection (a month later) fared somewhat better,

realizing there was extensive damage that could not be ruled out as tornado damage, admittedly damages were still missed. RUMF 7; AMF 7. The third inspection by Rimkus was admittedly incomplete and not thorough, as the engineer failed to inspect the attic. RUMF 12; AMF 2-3.

On July 25, 2013, two months after the loss, USAA determined that the damages sustained to Daily's house was caused by the tornado and covered under the policy. From there, a fourth inspection by Mr. Ball was scheduled. RUMF 8, AMF 9-10. Mr. Ball went to Daily's home on July 31, 2013, with NAPCO, its PDRP, to address the missed damages by Rimkus and confirm the scope of repairs that would be needed. This was completed on July 31, 2013, and was documented in the claim notes on August 1, 2013. At this point, four inspections have taken place. Of the recognized, and undisputed damages, USAA fully acknowledges that the roof had sustained significant damage, had huge holes in it, was spongy, and recognized it could pose a life-safety issue. Nevertheless, not a single person from USAA (including its engineer and PDRP) ever inspected the attic. RUMF 8, 12; AMF 2-3, 5, 9.

USAA concedes Daily's home was not a large house, and there was nothing about it that made it difficult for it to complete a thorough inspection. AMF 14. Moreover, USAA admits the attic was not "inaccessible," and it could and should have been inspected. *Id.* at 4. Yet, over the span of six (6) months and multiple inspections, that admittedly failed to address all of the issues, USAA now maintains, it was Daily's fault it was unable to accumulate *all* of the information needed to prepare an estimate and pay Daily's claim. The record simply does not support this position. RUMF 10; AMF 13. Rather, looking at the

manner in which USAA investigated Daily's claim, it is clear USAA violated its duty to her.

**B. *USAA Had All Of The Information Needed To Pay The Claim.***

When determining whether conduct is in bad faith the focus is on what the insurance company knew and when it knew it. *Newport v. USAA*, 11 P.3d 190, 195 (Okla. 2000). In its brief, USAA fails to present to the Court the whole of what it knew about Daily's claim and when it knew it. Perhaps more importantly, USAA fails to advise the Court what its claims handlers actually *knew* the evidence showed about Daily's claim and how, rather than accept that evidence, it worked to come up with contrary evidence.

First, USAA *knew* Daily's roof had significant holes, was spongy and likely posed a safety risk on May 28, 2013. RUMF 13; AMF 2 & 5. Further, USAA acknowledged on July 31, 2013, the possibility of significant truss damage, noting the trusses were putting pressure on the exterior wall, opening up the cracks. Nevertheless, the only payment Daily received for the roof from May 20, 2013 to October 9, 2013, was for shingles. RUMF 4. Mere payment of a portion of the loss, even if timely made, is not a defense to forgo a complete and thorough investigation. *Owen v. Farmers Insurance Co., Inc.*, 2014 WL 36643, *4 (E.D. Okla. Jan. 6, 2014).

Second, USAA *knew* on July 2, 2013 that payment for the AC unit and electrical was due and owing. RUMF 7; AMF 7. USAA had all of the information it needed, and had estimate, yet no payment was made. AMF 7 & 11. The record further demonstrates that on August 1, 2013, USAA also *knew* the scope and extent of undisputed damages and that amount anticipated to be paid would be at least $75,000, and could possibly go as high as

$90,000, and reset the reserves. RUMF 8, 11. Further, as of August 1, 2013, USAA also had it all of the information (including measurements) to prepare the estimate. RUMF 10; AMF 16-17.

Specifically, on August 1, 2013, after USAA established the damages sustained to Daily's home were *covered* under the policy, and Mr. Ball confirmed the scope of work, he made the a lengthy entry into the claims log, a portion of which states:

> Bart – pdrp has the assignment on the loss. We walked through the home. We reviewed the IA estimate of damage. **PDRP made notes and measurements in the home.** Since they have the assignment on the loss, they are going to **write the estimate with the items we reviewed**. I can review with me [sic] hand notes I made as we went thought [sic] the home. **The brick I feel needs to be replaced, the master bedroom needs to be added, master bathroom need to be added, kitchen damage needs to be addd [sic]. Foundation repair to the footing needs to be added with epoxy repair. The inside unit of the ac/furn will have to be added. Siding will have to [be] replaced per engineer estimate and due to brick being replaced. Updated the reserves on the file**.

Ex. 9, at USAA 2252, n. 111 (emphasis added). From these four important points are confirmed that: (1) after reviewing the loss and reviewing the engineering report, there was additional damage that Rimkus missed and that were *covered* under the policy, (2) USAA specifically rejected and expanded the scope of damages, as determined by Rimkus, (3) the extent of damage and the scope of work needed was addressed, and (4) USAA had everything it needed to pay the claim. *Id.* at 2251-2253, n. 108-111. At this time, reserves are increased to $75,000.00, with the potential to reach $90,000. RUMF 11. USAA accepted these findings, determinations and scope as to the nature and extent of the undisputed damages, and agreed that payment was required as of August 1, 2013. *Id.* at 8; AMF 15.

Further, and from the log note entries it is clear that from August 1st–12th, 2013, the

20

only noted "to-do-list" is "PDRP [to] upload with estimate to file with photos taken while with me at the home." Ex. 17, at USAA 2254, n. 118. Nothing else is stated as needed. On August 13, 2013, USAA received notice that Daily had retained counsel. Unsurprisingly on August 20, 2013, and for first time, the purported need for measurements suddenly appears, as do statements that Daily canceled an appointment scheduled for the 13th to obtain measurements. Id. at USAA 2255, n. 127. This entry is contradicted by the record.

Specifically, on August 2, 2013, the record reflects NAPCO was meeting with Daily on Tuesday to review installation of the AC unit. Id. at USAA 2254, n. 118; AMF 18. NAPCO's records confirm that an appointment with Daily was scheduled for August 6, 2013. Id. This appointment was later confirmed by NAPCO as having had occurred, but while there advised that someone at USAA cancelled the appt. Id. There is no record that Daily ever had an appointment with NAPCO on the 13th. Further it is unclear how Mr. Ball knew on August 12, 2013, that the purported appointment set for the next day was cancelled. Ex. 17, 2254-2255, n. 120 & 127. Further, and perhaps more importantly, there is no reference anywhere that any "measurements" were needed before Daily engaged counsel. RUMF 10; AMF 16-17.

Nevertheless, and regardless of the inherent inconsistencies (or perhaps better stated excuses) for why the estimate was not prepared, the evidence demonstrates USAA had the measurements, and everything it needed to pay the claim, but simply didn't. Indeed, USAA even concedes the previous adjusters and PDRP had measurements and photos, and the estimate could have easily been completed by either of them. Yet no one bothered to ask for this information. RUMF 10; AMF 16-17. Instead, USAA cancelled the assignment to

NAPCO on August 15, 2013, and then suddenly claims its hands were tied because it did not have the information to prepare the estimate.

Reasonable claim handling would require that, once USAA identified the undisputed damages and scope of necessary repairs/replacement, that it timely prepare an estimate and pay the claim. Certainly, it would have been reasonable for USAA to obtain the information from its own adjusters and/or contractor or frankly, have NAPCO complete the estimate, regardless of whether or not Daily wanted to engage them as a contractor. This simply did not occur. Rather, and in an effort to further delay the resolution of Daily's claim, USAA made the decision to take an adversarial position against her after she obtained counsel, and from there USAA sat on the claim, feigning its need for information it already had. RUMF 10; AMF 16-17.

Thus, even with this <u>knowledge</u>, now, more than two years after the loss, USAA, has still <u>failed</u> to pay for the (1) AC unit, (2) 50% of the foundation, (3) all the decking, or (4) trusses. AMF 11.[3] In *Newport, supra*, the Oklahoma Supreme Court explained that the duty of good faith and fair dealing "prevents an insurer from offering less than what its own investigation reveals to be the claim's value." 2000 OK 59 ¶ 17, 11 P.3d 190, 19711 P.3d at 197. The Court stated:

> [A]n offer to make an insufficient payment is equivalent to a denial of that portion of the claim lying between the insurer's offer and the value or range of value which the insurer has assigned to the claim.

*Id.* at ¶ 17, 11 P.3d at 197. Here, the record demonstrates that rather than pay what they

---

[3] Daily also maintains the November 15, 2013, estimate failed to pay for the actual costs of the repairs made, for all of the undisputed damages to her home. RUMF 15.

knew they owed, once counsel became engaged, USAA reassigned the claim to large loss adjuster, Duane Quinn, and to essentially seek a "do-over" from its previous coverage opinions and undisputed damage determinations. RUMF 10.

Indeed, and after counsel was engaged, USAA apparently decided to resurrect the issue of causation, even though they knew causation and coverage had already been decided and determined months earlier. RUMF 8, 11, 12; AMF 8-10. A fact tacitly proven by the absence of any information regarding the claims handling from July 25, 2013 through October 9, 2013 in USAA's Motion. It is unreasonable for USAA, knowing it had no defense to the undisputed damages it determined, documented and approved, to go back and purportedly rely on Rimkus to deny coverage and offer less than the full value of the claim. *Id.*

USAA maintains Mr. Ball was a competent and well-seasoned adjuster. They further agreed that he had full authority to make all decisions to resolve the scoping, estimating and measuring on behalf of USAA. AMF 15. Further, many discussions were had with Daily about the AC unit and that it would be replaced. *Id.* at 12. Thus, regardless of whether or not USAA regrets its past decisions, it cannot legitimately do an about-face and renege on coverage decisions it determined. AMF 9, 10. USAA's complete failure to ever reach an agreed upon scope with Daily and withholding its decision that the loss was covered under the policy, so that it could support its belated decision to deny the claim is hardly indicative of good-faith claims handling. *JB Properties, LLC v. Certain Underwriter at Lloyd's London*, 2010 WL 2196574, *6 (N.D. Okla. May 26, 2010). USAA's reliance upon

23

Rimkus to deny the claim does not create a "legitimate dispute" in this case.

### C. *USAA's "Dispute" Of Daily's Claim Is Anything But Legitimate.*

When examining whether a dispute is "legitimate", the Court must look the insurance company's determination in light of the information known or knowable to the insurer at the time the claim was denied. *Oulds,* 6 F.3d at 1442. In addition, an insurance company must conduct an adequate investigation of the claim or else any dispute raised may not be deemed legitimate. *Willis, supra.* The insurance company's dispute of the claim must also be based on information available to the insurance company at the time its performance is requested. *Id.; see also Buzzard,* 824 P.2d at 1109. Most importantly, even a "'legitimate dispute' as to coverage will not act as an impenetrable shield against a valid claim of bad faith where the insured presents sufficient evidence reasonably tending to show bad faith or unreasonable conduct." *Timberlake Construction Co. v. USF&G,* 71 F.3d 335, 343 (10th Cir. 1996), *citing Oulds,* 6 F.3d at 1440.

The evidence demonstrates that USAA's dispute of Daily's claim is not legitimate. After receiving the Rimkus report, USAA made a coverage decision that the damage was caused by the tornado. Indeed, Mr. Ball's August 1, 2013, claim note entry confirms, among other things that the house sustained structural damage from the tornado, and that damage to the (1) trusses, (2) foundation, (3) brick, (4) decking, (5) siding (6) gable ends (7) AC unit/Furnace and (8) interior damage to <u>every</u> room, had occurred, and was covered under the policy. RUMF 8; <u>Ex. 9</u>. As such, USAA's subsequent attempt to piecemeal acceptance of some of these findings (re: replacement of the brick vs. repair) and rejection of others

under the guise that the damages do not "fit" the Rimkus report does not constitute a legitimate dispute. USAA failure to complete an estimate from its **own analysis** of the undisputed damages is unreasonable and does not constitute a legitimate dispute. *Moore v. Allstate*, 2014 WL 200777, *4 (W.D. Okla. Jan 17, 2014); *Vintage Plastics, LLC v. Massachusetts Bay Insurance Co.*, 2012 WL 1142722, *3 (N.D. Okla. 2012). USAA's afterthought to go back to the Rimkus report to support its failure to pay what it already knew it owed, does not constitute a legitimate defense.

## II.   USAA IS NOT ENTITLED TO SUMMARY JUDGMENT ON DAILY'S BREACH OF CONTRACT CLAIM.

USAA erroneously claims Daily has abandoned her breach of contract claim because, at the time of her deposition, she had not yet filed her Third Amended Complaint. There is no merit to this argument. The law is abundantly clear, the Third Amended Complaint constitutes an abandonment of previous pleadings and all prior averments not made a part thereof. *Allen v. White*, 2010 WL 2985967, * 3, (W.D. Okla. April 22, 2010). Further, and contrary to USAA's position, after Daily filed her Third Amended Complaint, she properly supplemented her responses to USAA's interrogatories and has produced ample evidence to support her claim for damages, which USAA has refused to pay, despite its own admission that the amounts were due and owing. RUMF16.

Further, Daily has never abandoned her allegation that she has a valid claim under the policy, and nothing under the law prohibits a bad faith claim from proceeding without a breach of contract claim. *McCarty v. First of Georgia Insurance Company,* 713 F.2d 609 (10th Cir.1983). Rather, the law is clear there is no requirement that a breach of contract

claim be filed as part of a bad faith claim under Oklahoma law. *Id.* at 611-12; *see also*, *Roemer v. State Farm Fire & Cas. Co.*, No. 06-CV-0663-CVE-PJC, 2007 WL 527863, at *5 (N.D. Okla. Feb. 14, 2007); *Taylor v. State Farm Fire & Cas. Co.*, 981 P.2d 1253, 1258 (Okla.1999) (breach of contract and bad faith claims are separate bases for recovery, even though "indemnity for loss" is the centerpiece for both types of claims).

Here, USAA has refused to pay for the undisputed damages, it already determined existed. Some of these undisputed damages fall under the purview of the code requirements imposed by the City of Moore. USAA admits that if the City of Moore required the upgrade, the policy is triggered, and payment is required to be made. RUMF 14-15. No payment has been made. The fact that USAA wants to reargue issues on causation after-the-fact does not alleviate it from liability. USAA already determined that the damages to the footing and trusses were <u>caused by the tornado</u>, and as such are *covered* under the policy. RUMF 8, 10-12, AMF 9-10. As such, it cannot now avoid payment for code requirements on damages it conceded in August, 2013, were caused by the tornado. *Id.*

The same holds true for the wiring. USAA admits Daily's home sustained significant water damage. USAA further admits it did not advise Daily that it was okay to repair the roof until July 24, 2013, <u>after</u> it received the engineer report. RUMF 13. However, by this time the damage had already been done, and USAA finally conceded that all of the insulation had to be removed and replaced because it was soaked. AMF 5. From this, it is quite telling that while USAA agreed to replace *all* of the wet insulation and sheetrock, it refuses to accept that the wiring, which lays between the insulation and the sheetrock, was also wet. *Id.* The City of Moore required the wiring be replaced. The damage to the wiring

26

resulted from an admitted covered loss (rain water from the tornado). Thus, USAA cannot defer to all decisions on code to contractors and city requirements, and then avoid payment because, it doesn't like the result.

Without question, USAA has failed to pay all benefits owed under the policy and, as such, is in breach of its insurance contract with Daily. At a minimum, genuine issues of material facts remain, thereby making summary judgment inappropriate.

## A. There Is No Evidence Supporting Failure To Cooperate, Or That Undertaking Repairs To The Home Constitutes Spoliation.

USAA maintains Daily's failure to cooperate prohibited it from writing a full estimate. There is no merit to such an outlandish argument. Daily bent over backwards to cooperate with USAA, and it was USAA's unreasonable, bad faith conduct that brings the parties before this Court. RUMF 2. Nevertheless, USAA relies primarily upon *Bryant v. Sagamore Insurance Co.*, 597 F. App'x 968 (10th Cir. 2015), in support of its position. However, *Bryant* is inapposite to the facts here as there is no evidence that Daily ignored repeated demands from USAA for information, or that she was ever notified that her purported failure to respond would result in denial of coverage for failure to cooperate.

In point, USAA cannot and does not point to a single piece of evidence which supports that any delay by Daily somehow deprived it of information it did not already have. RUMF 17. Further, and perhaps more importantly, not a single adjuster testified that Daily or her counsel did anything wrong or that she failed to cooperate any point during the investigation. RUMF 2. In this same vein, the same holds true regarding USAA's assertion that Daily "spoliated evidence" because she began repairs to her home. Rather it is quite

ironic that, on the one hand, USAA sharply criticizes Daily in failing to "timely" repair her roof, and equates that delay as absolution of liability on its party for any water damage that resulted. Conversely, then, on the other hand, USAA takes the opposite position that Daily is equally at fault for beginning repairs. Simply stated, USAA cannot have it both ways.

The record demonstrates, Daily began making repairs in January 2014, after USAA closed its investigation. All of the major demolition occurred from August-September, well before any request by USAA to inspect was made. RUMF 16. Moreover, at no point did USAA ever advise Daily of the need to "preserve her damaged home," because it was "evidence," nor did it offer to step-in and secure the home and pay for her live elsewhere so that her home could serve as "evidence" of USAA's purported good faith claims handling. In truth, USAA's argument stretches the bounds of reason. USAA inspected the home on at least five (5) occasions before any repairs began. AMF 6. Further, USAA admits it had full access to the house on October 14, 2013, and had every opportunity to look at everything, including the wiring. RUMF 13, 17. An insurer's duty "to timely and properly investigate an insurance claim is intrinsic to an insurer's contractual duty to timely pay a valid claim." *Brown v. Patel,* 157 P.3d 117, 122 (Okla. 2007). Thus, USAA own failure to inspect the attic or the wiring, in spite of the prior inspections, cannot be displaced onto Daily. Indeed, the purported issues pertaining to the (a) trusses, (b) foundation (c) wiring and (d) AC Unit are illusory, as these coverage decisions had already been made by USAA, before any repairs started. RUMF 8, 10-12, 16, AMF 3, 6, 14. Thus, post-litigation questions (where the coverage has already been determined) offered to provide justification for withholding payment are nothing more than a belated excuse to avoid liability on its own failure to pay

for undisputed damages. AMF 5, 7, 9-12 & 15.

As for the so called "reinspection" in January 2015, no demand for an inspection under the policy was ever made by USAA, and the only purpose for such inspection was to manufacture a defense for its failure to pay undisputed damages, not to adjust the claim or consider any new evidence. Indeed, to date, USAA has not even considered the engineering report of Dr. Ramseyer. RUMF 17. Rather USAA's adjuster went to this inspection solely to "observe" and candidly admitted he stopped adjusting the claim altogether as soon as the litigation began. *Id*. Further, USAA's adjuster also conceded that the trusses were accessible, but ultimately stated none of the modifications to the home ultimately made a difference, because once litigation started, USAA changed course and determined the damage to the trusses, foundation and wiring were not caused by tornado and anything that did not "fit" the findings of Rimkus would be denied. Ex. 5, D. Quinn, 274:17-22. Simply stated, USAA's inability to perform a thorough inspection after multiple attempts, does not transform this family's attempt to repair their home into an evil deed to destroy evidence. There is no basis to punish Daily for trying to put her house back together, piece by piece, so that she and her family have a place to live.

## III. SUMMARY JUDGMENT ON PUNITIVE DAMAGES IS UNWARRANTED.

Oklahoma permits an award of punitive damages when the plaintiff demonstrates by clear and convincing evidence: "An insurer has recklessly disregarded its duty to deal fairly and act in good faith with its insured. . .[or] An insurer has intentionally and with malice breached its duty to deal fairly and act in good faith with its insured. . ." 23 O.S. § 9.1(B)(2) and (C)(2). In interpreting this statute, the Oklahoma Supreme Court

29

says "for punitive damages to be allowed there must be evidence, at a minimum, of reckless disregard toward another's rights from which malice and evil intent may be inferred." *Badillo*, 121 P.3d at 1106. Indeed, if "the summary judgment record contains sufficient facts and evidence that, viewed most favorably to Plaintiff, [to] support a reasonable finding that Defendant recklessly disregarded Plaintiff's rights to fair treatment, reasonable investigation, and timely payment," the Court should deny summary judgment. *Trinity Baptist Church v. GuideOne Elite Ins. Co.*, 2009 WL 3004031, *3 (W.D. Okla. 2009).

The evidence above demonstrates, a reasonable jury could find that USAA's conduct rises to the level sufficient for punitive damage. The record demonstrates USAA has known since the summer of 2013, that it owed for the AC unit and electrical, and an array of damages that USAA scoped and determined were caused by the tornado, but didn't pay it. USAA's attempt to rewrite history and take a position that flies in the face of its own to deny coverage after-the-fact can certainly leave the issue of punitive damages open. As such, the jury should be allowed to decide whether that evidence warrants an award of punitive damages.

## CONCLUSION

For the reasons set forth above, USAA's Motion for Summary Judgment must be denied. Daily respectfully pray this Court issue an Order overruling USAA's motion and allow her the opportunity to move forward with having the case at bar tried on the merits before a jury of their peers.

Respectfully submitted,

s/CAROLE DULISSE
Jeff D. Marr, OBA No. 16080
Carole Dulisse, OBA No. 18047
**MARR LAW FIRM**
4301 Southwest Third Street
Suite 110
Oklahoma City, OK 73108
Telephone: (405) 236-8000
Facsimile: (405) 236-8025
jeffdmarr@marrlawfirm.com
cdulisse@marrlawfirm.com
**ATTORNEYS FOR PLAINTIFF**

### CERTIFICATE OF SERVICE

I hereby certify that on this 12th day of June, 2015, I electronically transmitted the attached document to the Clerk of the Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

Jodi W. Dishman
Andrew J. Morris
William Leach
McAfee & Taft A Professional Corporation
211 North Robinson, 10th Floor
Oklahoma City, OK  73102
Telephone: (405) 235-9621
Facsimile: (405) 235-0439
Email: Jodi.dishman@mcafeetaft.com
    Andrew.morris@mcafeetaft.com
    Bill.leach@mcafeetaft.com
*Attorneys for Defendant*

/s/ Carole Dulisse
CAROLE DULISSE

31